**Lorentz LUDVIGSEN, Libelant,**

v.

**COMMERCIAL STEVEDORING CO., Inc., and J. L. Mowinckels Rederi, as owner of THE vessel HORDA, Respondents.**

No. A. 19547.

United States District Court
E. D. New York.

May 4, 1955.

Abraham M. Fisch, Sidney Schiffman, New York City, for libelant.

Thomas F. Keane, Brooklyn, N. Y., for respondent Commercial Stevedoring Co., Inc., Leo F. Hanan, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for respondent J. Ludwig Mowinckels Rederi, J. Ward O'Neill, David P. H. Watson, New York City, of counsel.

BRUCHHAUSEN, District Judge.

The libelant brought this action against the respondent, Commercial Stevedoring Co., Inc., hereinafter called "the stevedore" and the respondent, J. L. Mowinckels Rederi, the owner of the vessel, Horda, for personal injuries, upon the grounds of negligence and unseaworthiness of the vessel.

The libelant, a lighter captain, employed by the Lehigh Valley Railroad Company, claims that on July 19, 1950, his lighter, a Lehigh Valley scow, came alongside the vessel, Horda, for the purpose of discharging its cargo onto the vessel; that adjacent to the libelant's scow was an Erie Railroad scow, also moored alongside of the Horda; that a Jacob's ladder extended from the deck of the Horda to the deck of the scow; that the ladder had rope sides and flat wooden steps; that the libelant was obliged to use the ladder to reach the dock; that, unknown to him, part of the top of the ladder was drawn up or folded over the deck, creating a slack in the ladder; that while ascending it and when he almost reached the deck of the Horda, the slack was suddenly released, causing him to lose his hold on the ladder and fall to the deck of the Erie scow.

The vessel Horda was moored, bow in, on the east side of Pier 34, Brooklyn, loading cargo. The Erie lighter, with its bow out of the slip, was moored to the starboard side of the vessel, abreast of No. 2 hatch. The first three hatches of the 393.2-foot vessel were fore of the midships house. The 4th and 5th hatches were aft of the house. During the afternoon of the said day the Lehigh Valley lighter was moored to the starboard side of the Horda, bow facing in the slip. It was moored to the bow of the Erie, which was facing out, approximately even with No. 3 hatch.

The libelant testified that he first moored his lighter; that he washed up in his cabin, procured his shipping papers and crossed over onto the Erie lighter; that he tested the ladder by pulling it at the bottom; that he commenced to ascend the ladder; that when the had almost reached the top, it suddenly dropped about five feet, causing him to lose his hold and fall to the deck of the Erie lighter. It further appears that the Erie lighter with the injured libelant on board was moved across the slip to the west side of the neighboring pier; that he was there questioned by the police and removed to the hospital.

The principal issue is whether there was a slack in the ladder, caused by pulling the upper portion of it up onto the deck. It is undisputed that the ladder was owned by the shipowner; that it was put over the side of the ship by the stevedore; that it was properly fastened to the deck of the vessel Horda and was in good condition.

Libelant further claims that the employees of the stevedore used the ladder in descending to the lighter on the afternoon of July 19, 1950; that later they left the lighter; that the last two of the employees to ascend the ladder reached back and pulled up the ladder a few feet; that sometime thereafter the Lehigh Valley lighter arrived and that the accident happened at about 3:30 P. M.

The libelant's witness, Edgar Rojahan, testified that he was the captain of a Jacob Rice and Son scow, Arthur R, moored across the slip on the west side of Pier 35, and was loading copper; that during the afternoon the employees of the stevedore descended the ladder to the Erie; that they later ascended the ladder; that the last two men ascending the ladder, reached down and pulled up the ladder twice over the rail of the ship; that the libelant came out of his cabin with a paper in his hand, walked over to the Erie lighter, shook the ladder and climbed; that when he was a few steps from the rail the ladder came down and the libelant lost his grip and fell; that the Erie lighter was moved across the slip next to the witness' scow, and then the police arrived.

William Forwalk, captain of the Erie lighter, onto which the libelant fell, testified that the Lehigh Valley scow arrived and moored; that the libelant crossed to the Erie, grasped the ladder,

shivered it and pulled at it and then went up; that when libelant was almost at the top, it dropped; that he fell off the ladder and struck the cleat of the deck of the Erie; that prior to the accident the bottom of the ladder was about a foot above the deck of the Erie and that after the accident it hung several feet below its deck line.

The shipowner contended that the stevedore's employees had only been working on the Erie for a short time in the afternoon of that day; that very shortly after they finally ascended the ladder, the Lehigh Valley lighter arrived; that the stevedore knew of its arrival or should have so known, and should have provided the libelant with a proper means of ascent since the stevedore was under contract to discharge both lighters; that no one connected with the vessel, Horda, handled the ladder and that if a slack in the ladder had been created it existed for too short a time to constitute unseaworthiness of the vessel.

Christian Johannessen, third mate on the Horda, testified from the ship's log that the No. 3 hatch gang shifted to No. 2 hatch at 2:15 P. M. and went ashore from that hatch at 3:10 P. M.; that shortly thereafter, while securing the tarpaulin at No. 3 hatch, he learned of the accident, and that the police arrived at about 3:30 P. M.

The stevedore contended that at about 11:15 A. M. on July 19, 1950, its number 3 hatch gang, which had been working on the pier, switched to work offshore at hatch No. 2 from the Erie; that several of its employees descended the ladder before luncheon, ascended it at noon and again descended it at 1 P. M. and finally ascended it at about 2:30 P. M., upon receiving a signal from the hatch boss to transfer to the sister ship, Ronda, on the other side of the pier; that at no time had the ladder been pulled up by anyone connected with the stevedore and that its employees finally left the Erie lighter for work on another vessel.

The stevedore's witness Vincent Grillo, the hatch foreman, testified that at about 11:15 in the morning of that day, his gang switched to the Erie at No. 2 hatch; that his men procured the ladder; that he rigged it abreast of the winch house between No. 2 and No. 3 hatches; that at about 11:15 A. M. the men went down the ladder to the Erie; that at noon they came up for luncheon and went down again at 1 P. M.; that at about 2:30 P. M. he called up his men from the Erie to transfer them to the vessel Ronda, on the other side of the pier; that he followed his men onto the dock after covering up the hatch; that he neither noticed nor caused a slack in the ladder.

Anthony Puglia, a member of the gang, testified that he had been on the Erie both in the morning and afternoon and that when he finally ascended the ladder he neither placed nor noticed any slack in it.

Frank Marino, the header or boss of the dock section of the stevedore's gang, testified that he was on the Erie, after switching from the No. 3 hatch, both in the morning and afternoon; that he was the last man to ascend the ladder; that when he reached the deck of the Horda the other men had left and that he followed them to the dock to go on the Ronda, and that he did not place any slack in the ladder.

Bernard F. Anthony, employed by the Lehigh Valley Railroad Company, produced records to show that the Lehigh Valley lighter docked at 3:20 P. M. at Pier 34.

Joseph Valenti, lighter clerk for Commercial Stevedoring Co., Inc., testified from dock receipts and tally sheets, submitted in evidence, that the Erie commenced unloading on that day and finished on July 20th. Vincent Minno, timekeeper for the stevedore, testified from records that a gang shifted from the Horda to the Ronda at about 3 P.M. on the day of the accident.

Harold R. Quigg, a police officer, testified that he received a call concerning the accident at 3:40 P. M. on July 19th and was informed by the libelant and a

witness that the accident took place at 3:30 P. M.

The testimony of the libelant's witnesses is in direct conflict with the evidence of the witnesses of the respondent as to whether there was a slack in the ladder.

Rojahan, the scow captain of the Arthur R, moored across the slip, claimed to have witnessed almost every essential element of the accident, i. e., the descent and ascent of the stevedore's employees, the pulling up of the ladder by the last two, the arrival of the libelant, his testing of the ladder, his ascent and fall. Other portions of his testimony, however, weaken his credibility. He reiterated that the Erie was light at the time of the accident which was not the fact. On cross-examination, he testified that before any slack was placed in the ladder, it was bunched up to the height of a few feet on the deck of the Erie. This was contradicted by scow captain Forwalk. On direct examination, he stated that libelant came out of his cabin with a paper in his hand. On cross-examination he said libelant placed the paper in his pocket when he reached the Erie. This was contradicted by the libelant. On cross-examination he said libelant had one hand on the rail of the ship before falling, but quickly withdrew the statement on further questioning. He was vague about the time of the occurrence.

Rojahan, who claimed that he witnessed the events over a protracted period of time and from some distance, did not give his name to the police officer, although he was present when he arrived.

Forwalk, the captain of the Erie, corroborated the testimony pertaining to slack in the ladder but did not implicate the stevedore. He was not convincing. He was very exact as to the position of the bottom of the ladder before and after the accident, also stating that the libelant shivered and pulled the ladder, before ascending it. Yet, on cross-examination, he admitted that earlier in the day the bottom of the ladder was four or five feet below the deck of his lighter, between the ship and the lighter, similar to its position after the accident, as he observed it. If he was aware of the slack in the ladder, there is no evidence that he warned the libelant of it. It is important to note that the libelant did not even see this witness on deck at the time.

The testimony of the stevedore is more believable. Its employees were not positive about details and were frank to admit what they did not know or remember. Their testimony fully supports their contentions that they had nothing to do with the creation of slack in the ladder. Their records substantially support the testimony as to the times when work was commenced and completed.

Other tests of the libelant's case disclose its weakness. If the bottom of the ladder rested on the deck of the lighter, as Rojahan stated, no apparent reason existed for pulling up a portion of it and piling it on the deck of the vessel. On the other hand, the testimony of the witness Forwalk, that the bottom of the ladder extended below the deck of the lighter, between it and the vessel is likewise not plausible. No satisfactory explanation is offered as to why the stevedore's employees were so conscientious about avoiding damage to the lower part of the ladder by partly pulling it up on the deck of the vessel, especially in that the ladder did not belong to the stevedore. If those employees had any interest in preserving the ladder, it is more likely that they would have removed it from the side of the vessel and returned it to the shipowner for it had served its purpose for that day.

The libelant does not claim that the upper portion of the ladder which was pulled up and laid on the vessel's deck, was lashed to that deck. Under these circumstances, it would seem that the slack would have been taken up as soon as the libelant pulled on the bottom of the ladder and, surely so, as soon as he placed his full weight upon it when he first stepped upon the bottom rung of the ladder.

■ It is not disputed that the police report discloses that libelant immediately after the accident attributed his fall to the slack in the ladder. This is a self-serving declaration made by the libelant. Usually, one injured in an accident, considers himself blameless.

■ The libelant has failed to establish his claims by a fair preponderance of evidence.

■ Assuming that there was a condition of slack in the ladder, lasting about an hour, (and that claim has not been proved) it would not render the vessel unseaworthy. McCarty v. United States, D.C., 88 F.Supp. 251, affirmed without opinion in open court, 2 Cir., 196 F.2d 221; Hanrahan v. Pacific Transport Co., 2 Cir., 262 F. 951, certiorari denied 252 U.S. 579, 40 S.Ct. 345, 64 L.Ed. 726

Judgment for the respondents. Submit findings and decree on notice.